UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| R.G.,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION;<br><br>Defendant. | 5:25-CV-05096-CCT<br><br>REPORT & RECOMMENDATION |

**INTRODUCTION**

Plaintiff, R.G., seeks judicial review of the Commissioner's final decision denying his application for social security disability benefits under Title II of the Social Security Act.[1] R.G. filed a complaint and brief seeking reversal of

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II" benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference—greatly simplified—is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any. There are corresponding and usually identical regulations for each type of benefit. See, e.g., 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI). R.G. filed his application for Title II/SSD benefits only. His coverage status for SSD benefits expires on June 30, 2024. AR183. In other words, in order to be entitled to Title II benefits, R.G. must prove disability on or before that date.

the Commissioner's final decision denying him[2] disability benefits and to remand the matter to the Social Security Administration for further proceedings. See Docket Nos. 1, 9 & 14. The Commissioner seeks affirmance of the agency's decision below. See Docket No. 13.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g). This matter was referred to this magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and DSD LR 83.9.

## FACTS

### A. Procedural History

Plaintiff filed an application for Title II/SSD disability benefits on August 18, 2023,[3] alleging he became disabled on May 1, 2019, the date on which he was involved in a motor vehicle accident. Administrative Record (AR)17, 57, 174, 176. He alleged impairments of his low back and cervical spine, traumatic brain injury, vertigo, post-concussive syndrome, memory loss, balance issues, chronic headaches, post-traumatic stress disorder, anxiety and depression. AR79.

[2] Plaintiff's counsel refers to plaintiff as "her" in the complaint filed in this matter (see Docket No. 1), but plaintiff is consistently referred to as "he/him" in the AR. See, e.g. AR 17-30, 173. Plaintiff's counsel refers to plaintiff in the masculine in his brief. See Docket No. 9. The court assumes the typographical error lies in counsel's complaint rather than in the AR or subsequent briefing.

[3] There are references in the AR that plaintiff had filed a prior application for disability which was denied March 1, 2021, based on a finding that plaintiff could perform medium exertional work with a low social setting and could carry out detailed instructions of semi-skilled to skilled work. AR85, 221.

Plaintiff's disability application was denied initially and again on reconsideration. AR17. A hearing before an Administrative Law Judge (ALJ) was held and the ALJ denied benefits. AR17-30. Plaintiff sought review before the Appeals Council, which denied the request (AR1-5), making the ALJ's decision the final decision of the agency. Plaintiff then timely filed his complaint before this court.

Plaintiff was a younger individual (age 46) at the time his insured status expired in June 2024. AR28, 173, 183. He has an eleventh-grade education and past work experience in building, fence construction, and painting. AR58, 226-27. He worked part-time in a donut shop beginning in September 2024 and continuing through the date of the ALJ hearing March 20, 2025. AR58.

In this appeal, plaintiff alleges errors in his RFC pertaining to reading and learning and standing or walking on elevated surfaces, both of which are based on an examination and opinion by Certified Nurse Practitioner (CNP) Paulette Kirby. Docket No. 9 at 10.[4] Therefore, the court gives an overview of all the evidence, but focuses on the evidence pertinent to these issues.

**B. Medical Evidence**

**1. Initial Denial Evidence**

Dr. John Lassegard and psychologist Lynn Johnson were asked to render opinions as to plaintiff's physical and mental functioning in February 2024; however, they could not do so due to insufficient evidence in the record. AR79-

[4] The court cites to the page number of plaintiff's brief assigned by CM/ECF, the court's electronic docketing system. In plaintiff's initial brief, the pages of the brief do not correspond to the CM/ECF page numbers.

80. Dr. Lassegard and Ms. Johnson noted that there were very limited medical records even immediately following the May 1, 2019, automobile accident and that plaintiff had failed to attend two consultative examinations that were set up for him. Id.

**2. Denial on Reconsideration Evidence**

Dr. Lidia Siorek and Stephanie Fuller, PhD were asked to render opinions as to plaintiff's mental and physical functioning in June 2024; however, they again could not do so due to insufficient evidence in the record and the fact that plaintiff had not attended scheduled consultative exams. AR86-87.

**3. Medical Records—2019**

**a. Arizona Emergency Room Records**

On May 1, 2019, plaintiff was seen in the emergency room at Banner-University Medical Center in Tucson, Arizona. AR315. Plaintiff had been a back seat passenger in a motor vehicle accident in which he hit his head on the door. AR317. He complained of neck and back pain. Id. Plaintiff told medical staff he was a daily beer drinker and used marijuana. Id.

An examination of plaintiff's head, eyes, ears, nose, and throat revealed no abnormalities. AR318. A CT of plaintiff's head, brain, and cervical spine showed no acute intracranial abnormality and no evidence of fracture. AR318, 322. Plaintiff was discharged and told to follow up with his primary care physician if his symptoms worsened, changed, or failed to resolve. AR318.

On May 2, 2019, plaintiff again returned to the same emergency room complaining of continued left neck pain, lower back pain, left knee pain, headache, and body aches. AR327. Plaintiff reported no vision changes, nausea, or vomiting. Id. Examination of plaintiff's head, eyes, ears, nose, and throat revealed no damage or abnormalities and there were no focal neurological deficits. AR328. All imaging was normal. AR328-29. Plaintiff was prescribed a muscle relaxer for muscle spasms and instructed to take acetaminophen and ibuprofen at regular intervals. AR329.

**b. South Dakota Records**

Plaintiff saw Dr. Jason Knudson at Monument Health Family Medicine on May 9, 2019. AR374. Plaintiff told Dr. Knudson that his head hurt on the right side. Id. Plaintiff's wife told Dr. Knudson that plaintiff's speech has been different since the accident, "like he is talking over his tongue" and that he was having difficulty pronouncing words. Id. Plaintiff's sleep was intermittent and he was having bad dreams. Id.

Dr. Knudson recommended plaintiff implement sleep hygiene to help with concussion symptoms, meaning he should go to bed and get up every day at the same times. AR375. He recommended Tylenol or ibuprofen for headaches. Id. Dr. Knudson prescribed trazadone as a sleep aid. AR376.

Plaintiff saw Dr. Jay Bogard of Monument Health Family Medicine on May 23, 2019, complaining of significant insomnia and nightmares. AR368. Plaintiff explained that during his work as a painter he was suspended from a harness while painting objects that were difficult to get to and dangerous to

reach, but that he was not currently working. AR369. Dr. Bogard wrote that if plaintiff could paint without having to use ladders, chairs, or harnesses of any kind, plaintiff could probably return to work three to four hours a days as a trial. Id.

Dr. Bogard administered the Glascow Coma Scale[5] (GCS) to assess plaintiff's consciousness and all scores were normal. AR371. Plaintiff was oriented, not disoriented, had no cranial nerve or sensory deficit, was in no distress, and had normal behavior and thought content. AR371-72. His visual motion was normal, his heel-to-shin maneuver was normal, and he was able to balance on one foot for 30 seconds on both sides with his eyes open. AR371.

Dr. Bogard recommended plaintiff obtain physical therapy for his neck, pelvic pain, and concussion. AR373. He also recommended plaintiff see an eye doctor to see about getting prisms that might improve plaintiff's sense of ocular dizziness, and to buy and wear polarized sunglasses outside. Id. He also referred plaintiff for a neurology consult. Id. Finally, Dr. Bogard recommended plaintiff return for follow up in two to four weeks. Id.

Plaintiff saw Dr. Bogard again on June 20, 2019. AR363. Dr. Bogard noted that plaintiff scored high on the post-concussion symptom scale (100 out of 132). Id. He had not attended physical therapy or an eye doctor as

---

[5] The Glasgow Coma Scale can be administered as part of a neurological exam to assess a patient's consciousness. It consists of eye responses, a verbal response, and a motor response. Normal scores for each of these three categories are 4 (eye), 5 (verbal), and 6 (motor). See https://clevelandclinic.org/health/diagnostics/24848-glascow-coma-scale-gcs, last checked August 18, 2026. Plaintiff's scores on these tests were, respectively, 4, 5, and 6. AR371.

recommended due to cost and was waiting to see if worker's compensation would pay for it. Id. He described symptoms of anxiety—although he noted he had some anxiety before his traumatic brain injury (TBI)—mood swings, and emotionality. Id.

Dr. Bogard described plaintiff as oriented, cooperative, in no distress, with normal behavior and thoughts. AR365-66. Dr. Bogard observed that plaintiff's horizontal visual motor movements produced dizziness, plaintiff was hesitant and unbalanced in performing a heel-to-shin maneuver, and plaintiff could balance approximately 10 seconds on either foot with his eyes closed. AR366. Dr. Bogard referred plaintiff to Dr. Shannon Maxwell for psychological treatment, and recommended plaintiff attend physical therapy. AR367.

On July 18, 2019, plaintiff saw Dr. Bogard again. AR349. Lab reports for plaintiff were positive for cannabis (marijuana). Id. Dr. Bogard asked the lab to tell plaintiff that cannabis "will most definitely worsen his traumatic brain injury symptoms. It will make it harder to recover from both the dizziness and emotional aspects of the injury. It is my strong recommendation he discontinues cannabis completely." Id.

Plaintiff told Dr. Bogard on this date that he was still feeling too dizzy to go back to work as a painter. AR356. Plaintiff reported his concussion symptoms had improved, though he still reported having headaches and still had severe problems with dizziness and balance along with occasional blurred vision. Id. He was experiencing moderate sensitivity to light and noise, but said it was not too bothersome. Id. He reported severe difficulty with concentration

fatigue, low energy, and confusion at times. Id. He reported sleeping better at night. Id. Dr. Bogard noted that plaintiff was alert, oriented, and his behavior and thought content were normal. AR359. Dr. Bogard referred plaintiff to neurology and recommended physical therapy as well as speech therapy. AR362. Plaintiff was instructed to return to see Dr. Bogard again in one month. Id.

On July 18, 2019, plaintiff saw Cristina Sanders, Doctor of Osteopathy, at Regional Health. AR334. He was complaining of continued headaches in the wake of the car accident as well as difficulty with balance, loud sounds, and dizziness. AR335. Plaintiff reported that since the accident he had been without his eyeglasses while waiting for worker's compensation money to come through, and this was also contributing significantly to his headaches and dizziness. Id. Plaintiff reported his current medications to be Prozac, Tylenol, trazodone, ibuprofen, Wellbutrin, and a daily multivitamin. AR337.

A review of systems indicated tinnitus (ringing in the ears), visual disturbance (due to lost eye glasses), constipation, gait problem, neck pain, dizziness, light-headedness, headaches, and sleep disturbance. AR335, 337. Plaintiff appeared alert and pleasant, answering all questions appropriately with fluid thought and comprehension. AR338. Plaintiff's gait revealed independent ambulation, but difficulty with tandem gait and one-legged stance of greater than 20 seconds. Id. He became dizzy during this portion of the exam. Id. Dr. Sanders diagnosed plaintiff with a mild TBI without loss of consciousness, cervicogenic headache, vestibular dysfunction, current episode

of major depressive disorder without prior episode, and adjustment insomnia. Id.

Dr. Sanders recommended plaintiff attend physical therapy for his headaches and vestibular therapy to improve his balance and coordination. Id. He was prescribed naproxen daily for 10 days and told to follow up in three months for reassessment of symptoms. Id.

**4. Medical Records—2020**

**a. Dr. Bogard**

On June 18, 2020, plaintiff saw Dr. Bogard for a telehealth visit. AR342. He reported continuing to experience headaches and neck pain and indicated he would now like to pursue physical therapy. Id. He indicated he had PTSD and wanted to obtain services with psychology. AR343. He also stated he had speech difficulties and would like to see a speech therapist. Id. Plaintiff explained he did not follow up with neurology, physical therapy, psychology, or speech therapy due to cost and the fact that worker's compensation insurance would not pay for these services. Id. Dr. Bogard noted that plaintiff was negative for behavioral problems, dysphoric mood, and hallucinations and that plaintiff was not anxious or nervous. AR344. Plaintiff's speech was fluent and his mentation cogent. AR345.

Dr. Bogard summarized his findings and conclusions, writing that plaintiff had a mild TBI with symptoms that may or may not be attributed to the TBI including changes in speech (new stuttering and slurring). AR347. Dr. Bogard recommended physical therapy for his cervicogenic headaches,

predicting that plaintiff would see improvement after two to three weeks of therapy. Id. He recommended plaintiff see Dr. Shannon Maxwell for a neuropsychological evaluation relative to his TBI and for treatment of his anxiety, depression, and PTSD. Id. Dr. Bogard recommended plaintiff attend speech therapy for his speech stutter. Id. Dr. Bogard noted that plaintiff was attempting to obtain disability benefits, but in the meantime, he told plaintiff that Monument Health had a financial assistance program that could get most of plaintiff's medical needs covered. Id.

**b. CNP Paulette Kirby's Examination Report**

CNP Kirby saw plaintiff for a consultative examination on November 3, 2020. AR381-85. At that time the only medication plaintiff was taking was Tylenol PM. AR381. Plaintiff told Kirby that he was the primary caregiver for his and his wife's four-year-old son while his wife worked in a dental office. Id. Plaintiff stated that his dizziness and decreased balance prevented him from returning to work as a painter because he could no longer hang in a harness. Id.

Plaintiff told Kirby that he provided daily childcare for his four-year-old and their pet dog and that he can perform all activities around the house and his own self-care activities. AR382. He does become distracted, so his wife leaves him notes and lists of things to do. Id.

Kirby described plaintiff as calm, alert, and oriented, with mild anxiety at times. Id. He was able to remember three out of five objects and was a good historian throughout the exam. Id. Plaintiff reported pain up to a level seven in

his low back and tailbone and said he could only sit for five to 15 minutes and could not sit for long periods of time on hard surfaces. AR383. Kirby noted plaintiff sat comfortably throughout the exam in a hard chair. Id. Plaintiff noted that he had balance issues. Id.

Kirby noted plaintiff's gait is straightforward and he was able to stand on his heels and his toes and did not use assistive devices. AR384. Plaintiff was able to get up onto the scale and onto the exam table without difficulty or assistance. Id. He was able to bend, kneel, and squat, but felt most comfortable doing this very slowly or with objects nearby to hold onto. Id. He avoids bending, kneeling, squatting, or walking unless there were objects nearby in the event he would experience a bout of dizziness. Id.

Kirby wrote that her clinical impressions were TBI without loss of consciousness, cervicogenic headache, vestibular dysfunction resulting in sporadic and intermittent dizziness, anxiety and degression, insomnia, and low back pain. Id.

CNP Kirby's conclusions were as follows:

> Based on my examination of the claimant, his history and the currently available information, he is able to lift greater than 25 to 30 pounds intermittently throughout the course of the day feeling most comfortable with carrying for short distances in an environment where he is able to hang on to objects. **Claimant is probably safest on nonelevated surfaces.** He is able to bend and squat. He has adequate hearing, clear and fluent speech. He currently is unable to travel independently. He is able to perform all activities and chores around the household and daily selfcare activities. He is able to perform coordinated and repetitive motions with his hands throughout the course of the day. He is probably best in an environment that requires simple type task activities or those that allow reminders or supervision. **He is probably best with activities that do not require extensive reading or**

> **learning how to perform activities while on the job or in the home setting.**
>
> During the exam today, **claimant demonstrates potential for significant improvement in his prognosis with physical therapy** and psychology for PTSD, traumatic brain injury. **Claimant denies use of either of these professional services** since his motor vehicle accident in May of 2019 secondary to lack of funds. Claimant expresses desire to resume personal activities such as sports and being out with his family as well as returning to full time employment.

AR384-85 (emphasis added).

**5. Medical Records—2021**

**a. Dr. Greg Swenson**

On January 5, 2021, Greg Swenson, Ph.D. performed a consultative psychological examination of plaintiff. AR393-96. Dr. Swenson found plaintiff to be properly oriented, facial expression and eye contact were normal, he understood questions and provided appropriate responses, hearing and vision were adequate, and his speech was somewhat slow in pace, but otherwise normal. AR394.

Dr. Swenson wrote that plaintiff's attention was adequate, immediate recall of verbal matter was poor, recent memory was intact, long-term memory was intact, and his levels of logical reasoning, judgment and vocabulary were low-average. Id. He had appropriate affect with anxious mood. Id. His thought processes and content were normal. Id. He understood and followed instructions adequately. Id. Factual knowledge and mental calculations were below average. Id.

Dr. Swenson wrote that plaintiff was capable of independent grooming and hygiene and all basic daily living tasks. AR395. He had difficulty falling asleep, but sleeps six to seven hours per night. Id. Plaintiff frequently prepares supper and does some of the housekeeping. Id. Although plaintiff is capable of making purchases and managing money, he has deferred these areas to his wife since the TBI. Id. He seldom drives and when he does it is for only short distances. Id.

Dr. Swenson's diagnoses were PTSD, generalized anxiety disorder, and mild neurocognitive disorder due to TBI. Id. He opined that plaintiff's prognosis was "fair." Id. Dr. Swenson wrote that plaintiff was capable of managing financial matters, but had some limitations in mathematics. AR396.

**b. Physical Therapy Records: August 2021-September 2022**

Plaintiff attended physical therapy intermittently from August 24, 2021, to September 15, 2022. Over the course of his treatment, plaintiff reported improvements including a 25 percent increase in function (AR430), relief from pain and stiffness (AR432), fewer headaches (AR474, 484, 487, 495, 589), no dizziness (AR561), and overall "feeling good" (AR502, 506, 538, 603). Plaintiff noted that he quit taking prescribed Lexapro (AR474). Plaintiff also reported increased pain on two occasions because he had been painting (AR508, 581).

The physical therapy did not solve all of plaintiff's problems, as he continued to report headaches (AR474, 508, 518, 526, 551, 591); however, he also reported that Tylenol usually resolved these headaches (AR468, 535, 573). He described his balance as "iffy," but responded well to balance training

(AR557, 558, 600). It was noted in October 2021 that it would take time for plaintiff to get to the point where he could resume work (AR458), but it was clear this comment was made in the context of plaintiff resuming his work as a painter on a ladder (AR439, 512, 571). Plaintiff was discharged from physical therapy February 7, 2023, as he had not returned to any appointments since September 15, 2022. AR605. Thereafter plaintiff returned for a couple more appointments. AR607-12.

**c. Dr. Cherise Lerew**

On December 21, 2021, Cherise Lerew, PhD., performed a consultative psychological examination of plaintiff. AR406-10. Her report consists of no testing and no outside validation, but merely a recitation of her lengthy interview with plaintiff and her impressions based on plaintiff's subjective statements. Id. Based on plaintiff's own reports, Dr. Lerew opined plaintiff could be suffering from neurocognitive effects from the car accident, but it was difficult to tell if these problems were in existence before the accident because plaintiff reported dropping out of school and having significant learning issues at a young age. AR410. Dr. Lerew opined that some of plaintiff's issues may get better with time, physical therapy, and counseling as it appeared that plaintiff's complaints had already improved with these services. Id.

**6. Medical Records—2023**

Plaintiff was seen by Dr. Bogard on November 27, 2023, after an interval of one year and nine months since plaintiff's last visit. AR630. Plaintiff explained he wanted Dr. Bogard to perform a disability evaluation. AR631, 642.

Dr. Bogard recommended that plaintiff visit a disability physician because disability was not Dr. Bogard's specialty. Id. Dr. Bogard did fill out disability paperwork in the form of a check-the-box form that asked him to rate plaintiff's mental residual functional capacity. AR630, 699-700. Dr. Bogard also filled out a form indicating plaintiff's physical abilities. AR701.

#### 7. Counseling Records

Plaintiff attended Belle Fourche Counseling (BFC) from May 2021 to October 2022 for a total of 32 appointments, but no actual records from these counseling sessions are in the AR. AR628. Plaintiff resumed counseling with BFC on September 5, 2024. AR669. This was after plaintiff's insured status for Title II disability benefits expired in June 2024. Plaintiff's medications consisted of medical marijuana and Tylenol. AR676. He was treated for generalized anxiety disorder. Id.

### C. Plaintiff's Function Reports

#### 1. August 2020 Report

Plaintiff filled out a report of his daily functioning on August 6, 2020. AR209-16. He stated that he cared for his then three-year-old son and a dog. AR210. He described his impairments as insomnia, blurred vision, headaches, hemorrhoids, and constipation. AR210. He prepared simple meals of hamburgers, hot dogs, or sandwiches a couple of times per week. AR211. He stated his wife needed to leave him notes to take his medications. Id. He stated his wife did the yard work when it was hot because he would lose his balance. Id.

Plaintiff stated he left the house "as often as I can" and would do so on foot or by riding in a car. AR212. He stated his wife handled the bills and manages the bank account due to plaintiff's bad memory. Id.

Plaintiff described his hobbies and interests as going for walks, playing with his son, and watching television. AR213. He stated he gets light-headed when he walks. Id. He also stated he has no balance and gets headaches. Id. He noted that he was socializing only with his wife and son and with others on the phone due to Covid-19. Id. He also recounted that he does grocery shopping but needs someone to accompany him. Id. He stated that loud gatherings give him headaches. Id.

Plaintiff wrote that his impairments affected his ability to lift, bend, sit, climb stairs, remember, and complete tasks. AR214. His impairments did *not* affect his ability to stand, reach, walk, kneel, talk, hear, see, concentrate, understand, follow instructions, use his hands, or get along with others. Id. Plaintiff said how well he followed instructions depended on the task, but that sometimes he was able to follow instructions well. Id. He stated he could follow spoken instructions better than written. Id.

Plaintiff wrote that he had a difficult time processing stress and that change "ruins my day." AR215. He also stated he had great difficulty riding in a car. Id. Plaintiff admitted that he was not taking any of the medications that had been prescribed for him because he did not like the effects and he felt they did not help. AR216.

**2. November 2023 Report**

Three years later plaintiff filled out another function report and again identified his neck and back as hurting daily. AR244. He also stated he did not have good balance and had a hard time focusing on multiple-step instructions. Id.

Daily activities consisted of feeding his dogs and letting them out to potty, sometimes doing laundry, and picking his son up and caring for him. AR245. Plaintiff wrote that his wife helped him care for his son and the dogs. Id. Plaintiff indicated he could dress, bathe, shave, and feed himself as well as use the toilet independently. Id. Plaintiff could prepare simple meals like frozen dinners, heat up leftovers, and take meat out and season it. AR246. He did laundry, vacuumed, and mowed when not in pain. Id. Plaintiff indicated his wife left him notes to remind him to take his medications and to do chores. Id.

Plaintiff indicated he left the house daily to walk and pick up his son. AR247. He was able to go outside alone and could drive and shop once a week for 30-40 minutes. Id. Plaintiff could count change, but left the bill paying and management of bank accounts to his wife. Id. He liked to watch sports on television but could not watch a whole game. AR248. He socialized with others on the telephone. Id. He indicated he has no trouble getting along with family, friends, neighbors or others. Id.

Plaintiff indicated his impairments affect his ability to lift, bend, sit, talk, memory, complete tasks, concentrate, understand, and follow instructions. AR249. He indicated no impairment of his ability to squat, stand, reach, walk, kneel, hear, climb stairs, see, use hands, or get along with others. Id. He stated

he finishes what he starts (conversations, chores, reading), but has not finished watching a movie "for years." Id. Plaintiff wrote that he no longer handles stress or changes in routine well. AR250. Plaintiff identified the only medications he took as Tylenol and vitamins. AR251.

**D. Third-Party Function Report**

Plaintiff's wife, "J," filled out a third-party function report three years later, on November 13, 2023. AR232-39. She wrote that plaintiff woke up every day with back and neck pain and that he struggles with depression and anxiety. AR232. He is "set off" by loud noises and cannot ride long distances in a car. Id.

In a typical day, plaintiff will do a load or two of laundry, but sometimes forgets clothes in the washer. AR233. Plaintiff picks up his son daily from the bus two blocks away—on foot if the weather is nice or by car if it is cold. Id. He cares for the couple's two dogs, but J walks the dogs. Id. Plaintiff helps care for his son along with J. Id. If plaintiff is having neck pain, J helps him put his shirt on; otherwise, plaintiff bathes, dresses, shaves, feeds, and uses the toilet himself. Id. Plaintiff takes his son to the park to play daily. AR236.

J wrote that plaintiff mows the lawn if his pain isn't too bad. AR234. He can walk and drive a car short distances. AR235. He buys a gallon of milk two blocks away. Id. Plaintiff could count change, but not pay bills or handle savings or checking accounts. Id.

J wrote that plaintiff could follow instructions if given each task one at a time. AR237. If too much information is given up front "he gets lost." Id. He got

along well with authority figures. AR238. J wrote that plaintiff could handle changes in routine if he was alerted to the change ahead of time and given time to process the change. Id. He did not handle stress as he was easily overwhelmed. Id. J wrote that plaintiff took only Tylenol and vitamins. AR239.

## E. Hearing Before the ALJ

### 1. Plaintiff's Testimony

A hearing was held before the ALJ on March 20, 2025. AR53-74. The plaintiff, his attorney, and the ALJ appeared by video.[6] AR55. The court reporter and the vocational expert (VE) appeared by phone. Id.

Plaintiff testified he lives at home with his wife and eight-year-old son. AR57. He also testified that he finished the eleventh grade before leaving high school. AR58. He was not in special education classes except for reading, he thought. Id. At the time, plaintiff had a driver's license and drove "a couple blocks" to work twice per week. Id. His job required him to hand out donuts, but not to work the cash register. Id. Plaintiff testified he worked in 2020 after the 2019 alleged onset date, but the ALJ did not have records of any earnings from 2020. AR59. At the time of the hearing, plaintiff was working two days a week at a donut shop from 6 a.m. to 1 p.m. AR58. He did not get breaks at work except for periods when there were no customers. AR66.

Plaintiff indicated his anxiety and his lower back pain were the primary reasons he believed he could not work. AR59. Plaintiff testified he could

[6] The preface to the transcript indicates all parties appeared in person, but the actual transcript of the ALJ's opening remarks indicates the parties appeared by video or phone. AR55. The court assumes the preface is in error.

manage, clean, and dress himself. AR60. He testified that he vacuums the house, does the laundry with his wife, carries the basket to the laundry room, and does some of the cooking and light shopping. AR60-61.

Plaintiff testified that activities like shoveling snow and mowing aggravate his back pain. AR62. When his back hurts, he will lay flat on the floor for a minute. Id. He is able to walk around the block and be on his feet for up to 15-20 minutes at a time. Id. Plaintiff testified he can sit for 10-15 minutes at a time. AR62-63. He can lift and carry up to a gallon of milk. AR62.

Plaintiff testified he had memory problems such as not being able to remember anyone's birthday, not even his mother's (though he knows the months). AR63. He also stated he could not remember people's phone numbers anymore. Id. Plaintiff testified he has difficulty understanding information and instructions and that is why his employer at the donut shop did not train him to use the cash register. AR63-64. At work he made a written list of the things to do at closing because he could not remember independently. AR65-66. At work he sometimes must ask customers to repeat what donuts they want, especially when there are large orders. AR66.

Plaintiff testified that he does not have trouble getting along with others. AR64. Plaintiff also testified that he gets headaches three to five times a week, some of them severe. Id. He takes Tylenol for headaches and sometimes they go away. Id.

**2. Testimony of the VE**

First the ALJ proposed a hypothetical that encompassed the same functional limitations that the ALJ would later conclude constituted plaintiff's RFC. AR68. The ALJ asked the VE if there were jobs available that a person with that RFC could perform and whether those jobs existed in significant numbers in the national economy. Id.

The VE responded that there were such light exertional unskilled jobs—namely routing clerk,[7] sales attendant,[8] and collator operator.[9] AR68-69. The ALJ then asked whether there were jobs available if the person with this RFC needed a chart or a list of tasks that the person could reference when doing the job. Id. The VE responded that the same three jobs would still be available and that requesting a list or chart would not be considered an accommodation. Id.

As to the jobs the VE identified, he testified that the Dictionary of Occupational Titles does not specify information about jobs such as whether there is climbing of ladders, ropes, and scaffolds, the need for standing and walking, and the breaks or changes of position. AR72. The VE testified he relies on his experience in the vocational field to determine which jobs fit all the limitations posed by the ALJ in its hypothetical.[10] Id.

The ALJ asked whether any jobs would accommodate sitting for five minutes out of every 30 minutes of walking or standing. AR69. The VE testified

---

[7] Dictionary of Occupational Titles (DOT) code 222.687-022.

[8] DOT code 299.677-010.

[9] DOT code 208.685-010.

[10] The VE's qualifications are detailed in his CV at AR297-300.

that the collator operator job would allow for that circumstance. AR70. The job of office helper would also fit that RFC according to the VE. Id.

Plaintiff's counsel then asked if the hypothetical person with the RFC posed by the ALJ would overall be 15 to 20 percent less productive than similarly placed coworkers, whether that person could still perform the identified jobs. AR73. The VE indicated he would not be able to perform the jobs. Id.

**F. Decision of the ALJ**

The ALJ applied the five-step analysis described in greater detail below. AR17-30. At step one, the ALJ found plaintiff had not engaged in substantial gainful activity. AR19. At step two, the ALJ found plaintiff had the following severe impairments: post-traumatic stress disorder (PTSD), generalized anxiety disorder, traumatic brain injury with mild neurocognitive disorder, cervicogenic headaches, and vestibular dysfunction. Id.

At step three the ALJ found plaintiff did not meet or equal the severity of any listed impairment. AR20. The ALJ engaged in extensive analysis of plaintiff's mental impairments at step three, deciding plaintiff did not meet the requirements of Listings 12.02, 12.06, or 12.15. Id. Applying the Paragraph B criteria, the ALJ found plaintiff had only mild limitations in understanding, remembering, and applying information; mild limitations in interacting with others; mild limitations in adapting or managing oneself; and moderate limitations with regard to concentrating persisting, or maintaining pace. AR20-

21. The ALJ stated that its analysis at step three did not constitute its mental RFC. Id.

At step four, the ALJ formulated the following physical and mental RFC:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; stand or walk six hours total in an eight hour day and sit six hours total in an eight hour day; should never climb ladders, ropes, or scaffolds; can occasionally climb ramps or stairs, stoop, kneel, crouch or crawl; can never balance on narrow or slippery surfaces; is limited to work in an environment with not more than a moderate noise level; is limited to occasional exposure to extreme cold, extreme heat, vibration, and atmospheric conditions; should have no exposure to hazards; can understand, remember and carry out simple instructions using judgment to make simple work-related decisions and dealing with occasional changes.

AR21-22.

The ALJ considered plaintiff's description of his symptoms and concluded that plaintiff's impairments could reasonably be expected to cause those symptoms, but not with the intensity, persistence, and limiting effects described by plaintiff. AR23. The ALJ concluded plaintiff's description of his symptoms was not entirely consistent with the medical and other evidence in the record. Id.

The ALJ then reviewed the medical evidence of record, including consultative examinations, and evaluated that evidence. AR23-28. Because plaintiff's appeal to this court relies heavily on the ALJ's treatment of CNP Paulette Kirby's opinion, the court reproduces that paragraph of the ALJ's written opinion:

> Paulette Kirby, CNP opined the claimant is able to lift greater than twenty to thirty pounds intermittently, is safest on non elevated

> surfaces, is able to bend and squat, is probably do best [sic] with simple type task activities and with activities that do not require extensive reading or learning how to perform activities while on the job (5F; 6F). The opinion is partially persuasive. The CNP's opinion is supported by her examination findings of no more than some tenderness in the back and some mild anxiety. The opinion is consistent with evidence of mild neurological disorder (7F). However, the opinion that the claimant can lift over twenty pounds is inconsistent with the claimant's report of some balance issues and the rare finding in the record of vestibular dysfunction (i.e. difficulty with tandem gait and one legged stance greater than 20 seconds) (3F/5). Given this factor and giving some consideration to the claimant's subjective reports, the undersigned found the evidence better supports carrying and lifting limitations more congruent with light work.

AR26-27.

Considering the RFC formulated by the ALJ, the ALJ concluded at step five that plaintiff could perform other work that existed in significant numbers in the national economy. AR30. Specifically, the ALJ concluded plaintiff could perform the work of routing clerk, sales attendant, and collator operator. AR29. Therefore, because there was work plaintiff was capable of performing, the ALJ found plaintiff was not disabled. AR30.

## DISCUSSION

### A. Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by "substantial evidence [i]n the record as a whole." 42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009) (citing Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997)). "[S]ubstantial evidence [is] defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to

support [the Commissioner's] conclusion.' " Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal quotations and citations omitted). Yet, "[i]n conducting [its] limited and deferential review of the final agency determination under the substantial-evidence standard, [the court] must view the record in the light most favorable to that determination. Chismarich v. Berryhill, 888 F.3d 978, 980 (8th Cir. 2018).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Minor, 574 F.3d at 627. The Commissioner's decision may not be reversed "merely because substantial evidence would have supported an opposite decision." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). "[I]f it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings," the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993) (quoting Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the

entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311 (finding "appropriate deference" should be given to the SSA's interpretation of the Social Security Act).

**B. The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. § 404.1505.[11] The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[11] Although R.G. has applied for both Title II and Title XVI benefits, for the sake of simplicity, the court herein cites to only the regulations applicable to Title II where the corresponding Title XVI regulation is identical. It is understood that both Titles are applicable to R.G.'s application. Any divergence between the regulations for either Title will be noted.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. The five steps are as follows:

> **Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, she is not disabled and the inquiry ends at this step.
>
> **Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e., whether any of the applicant's impairments or combination of impairments significantly limit her physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments, the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 404.1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).
>
> **Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment*, the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).
>
> **Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe*) to determine the applicant's residual functional capacity (RFC). If the applicant's

RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e)-(f); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five. 20 C.F.R. §§ 404.1520(f).

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 404.1520(g).

## C. Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry. Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994). "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting is "a long-standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 n.3 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

## D. Assignments of Error

Plaintiff asserts two errors were made by the ALJ. First, plaintiff asserts the ALJ should have included limitations on reading and learning as part of the

mental RFC. Docket No. 9 at 10. Second, plaintiff asserts the ALJ should have included limitations on his ability to navigate elevated surfaces in the physical RFC. Id. at 21. As noted earlier, both of these functional limitations asserted by plaintiff derive from CNP Kirby's examination report.

### 1. Standard Applicable to RFC Determinations

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered). "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability. 20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013). The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are nonsevere. Lauer, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996). Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual

functional capacity is a medical question."[12] Lauer, 245 F.3d at 703 (citations omitted) (emphasis added). Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p. If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." Id. "The RFC assessment must always consider and address medical source opinions." Id. If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." Id. Medical opinions are evaluated based on whether they are supported and consistent with other evidence in the record. 20 C.F.R. § 404.1520c. Other factors considered in determining what weight to give a medical opinion are whether the medical provider had a relationship with the claimant and whether the provider has a specialization that makes them more qualified to render an opinion within a particular area. Id.

[12] Relevant evidence includes: medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations. See SSR 96-8p.

Ultimate issues such as RFC, “disabled,” or “unable to work” are issues reserved to the ALJ. SSR 96-8p at n.8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source. Id.

“When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity.” SSR 96-8p. However, the ALJ must “make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC.” Id.

When writing its opinion, the ALJ “must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . .. In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.” Id.

Finally, “to find a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.” Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (citations omitted, punctuation altered); SSR 96-8p, 1996 WL

374184, at *1 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

It is always the plaintiff's burden to prove disability and to demonstrate his RFC. Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016); Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005).

**2. Mental RFC**

Specifically as to the ALJ's mental RFC formulation, plaintiff argues that the ALJ found CNP Kirby's opinion partially persuasive, but rejected CNP Kirby's opinion as to plaintiff's ability to lift and carry. Docket No. 9 at 15. Plaintiff argues that because the ALJ never rejected CNP Kirby's opinion as to plaintiff's ability to learn and read, that the ALJ found that part of the opinion persuasive. Id. at 16-17. CNP Kirby opined that plaintiff should be limited to activities that do not require extensive reading or learning how to perform job activities. Id. This functional limitation on reading and learning, plaintiff argues, should have been in the mental RFC and was not. Id. Plaintiff urges this court to reverse and remand on that basis. Id. To reiterate, CNP Kirby wrote "[Plaintiff] is probably best with activities that do not require extensive reading or learning how to perform activities while on the job or in the home setting." AR385.

The Commissioner argues that CNP Kirby rendered an opinion about what conditions were required for plaintiff's "best" performance, but the

Commissioner's regulations require the ALJ to ascertain what is the most a plaintiff can do despite his impairments, not what is required for "best" performance. Docket No. 13 at 7 (citing 20 C.F.R. §§ 404.1545(a), 404.1566(c)). Therefore, CNP Kirby's opinion, even if persuasive on the point of reading/learning, does not translate automatically into a mental limitation in the RFC. Id. The court notes the Commissioner is correct that the legal standard is what is the most a plaintiff can do with his limitations, not what restrictions in the job are required for "best" performance. 20 C.F.R. § 404.1545(a).

Furthermore, the Commissioner argues that the ALJ's RFC formulation limiting plaintiff to remembering and carrying out simple instructions using judgment to make simple work-related decisions adequately encompasses the functional limitations supported by CNP Kirby's opinion as well as substantial evidence in the record as a whole. Id. Finally, the Commissioner points out that the mental RFC is congruent with the ALJ's finding at step three that plaintiff had moderate limitations in concentrating, persisting, or maintaining pace and mild limitations in all other areas of mental functioning. Id. at 11.

Plaintiff responds in his reply brief that under the paragraph B criteria, the ability to (1) concentrate, persist, or maintain pace is separate and distinct from (2) the ability to understand, remember, or apply information. Docket No. 14 at 2. Plaintiff further argues that the RFC limitation on plaintiff's ability to "understand, remember and carry out simple instructions using judgment to make simple work-related decisions and dealing with occasional changes" does

not encompass the moderate limitation the ALJ found with regard to concentrating, persisting, or maintaining pace; the RFC limitation addresses only the ability to understand, remember, or apply information. Id. at 3. Plaintiff argues the ALJ relied specifically on CNP Kirby's opinion in determining that plaintiff was moderately limited in concentration, persistence, and pace. Id. at 2 ("The ALJ decided that Plaintiff has moderate limitation in the ability to concentrate, persist, or maintain pace (Tr. 21), based, in part, upon CNP Kirby's persuasive opinions (Tr. 384-385, 26-27)." Therefore, plaintiff concludes that the ALJ's finding of moderate limitation in concentration, persistence, and pace must be reflected in the mental RFC and is not—which requires remand.

Plaintiff's rejoinder in his reply brief overlooks the specific statement made by the ALJ in its opinion. The ALJ specifically stated that her analysis of paragraph B criteria at step three did *not* constitute her mental RFC formulation. AR21. Therefore, one cannot take the ALJ's step three analysis (moderate limitation in concentration, persistence, and pace) and assume it must automatically be reflected in the RFC formulated at step four. Gann v. Colvin, 92 F. Supp. 3d 857, 884 (N.D. Iowa 2015) (a limitation at step three does not automatically translate into a functional limitation in RFC at step four). Instead, the impairments found at step two should be considered when formulating RFC, but they do not "automatically translate into limitations on the claimant's ability to work." Id.

In the Gann case, the ALJ had found marked limitations in plaintiff's ability to concentrate, persist, and keep pace at step three. Id. at 884. That ALJ, like the one in this case, also stated in its opinion that its analysis at step three was not part of the RFC assessment. Id. Gann argued that the marked limitations in concentration, persistence, and pace must be accounted for in the RFC or the opinion was internally inconsistent. Id. The court rejected this assertion, noting that RFC "is not simply a laundry list of impairments and limitations," but instead represented what Gann was still capable of doing despite his mental limitations. Id.

Furthermore, in this case, plaintiff's rejoinder in his reply brief subtly shifts his argument from what he argued originally. In his initial brief, plaintiff faulted the ALJ for failing to include a limitation, derivative of CNP Kirby's opinion, on reading and learning. See Docket No. 9 at 16-17. That reading/learning limitation fits neatly within the RFC the ALJ *did* formulate (understand, remember and carry out simple instructions). CNP Kirby's opinion about reading/learning did not implicate concentrating, persisting, or maintaining pace. Plaintiff is now arguing that a limitation on concentrating, persisting or maintaining pace should have been included in the RFC, ostensibly based on CNP Kirby's opinion, but without acknowledging that the Kirby opinion as to reading/learning is not related to concentration, persistence, or pace.

Ultimately, setting aside the shifting nature of plaintiff's argument, the court is required to evaluate the record as a whole and to determine if the ALJ's

mental RFC is supported by substantial evidence. Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006); Gann, 92 F. Supp. 3d 885.

Although plaintiff reported extreme anxiety, PTSD, and poor concentration, he did not follow up on Dr. Bogard's June 2019 recommendation that he seek mental health therapy. AR367. Plaintiff did not seek help for his mental impairments until he began counseling in September 2021, two years and four months after the motor vehicle accident which produced plaintiff's physical and mental impairments. AR628. But even those counseling records are not before the court because they were not submitted to the agency below. AR24. This failure to seek mental health treatment for so long is striking in view of Dr. Bogard telling plaintiff on June 18, 2020, that financial assistance was available (AR347), and because worker's compensation began paying for physical therapy in August 2021.

Plaintiff also failed to follow up with a neurology consultation (AR362, 342, 344), declined to take the anxiety and depression medications prescribed for him (e.g. AR239, 251, 474, 676), and disregarded his physician's advice to stop smoking marijuana as that was exacerbating his TBI and emotional symptoms (AR349, 676). Plaintiff is continually described in his medical records as alert, responsive to questions, and able to follow instructions. See, e.g. AR365-66, 359, 338, 382, and 394.

The ALJ discounted plaintiff's subjective descriptions of his mental limitations because they were inconsistent with his daily activities. Since the May 1, 2019, motor vehicle accident, plaintiff was caring at home by himself for

his son who was, at the time, three years old, while plaintiff's wife worked in a dental office six days a week. AR210, 381. As his son grew while this case was progressing, plaintiff was responsible for picking him up every day after school. AR233, 245. Although plaintiff claimed he needed reminder notes from his wife about a variety of things (household chores, taking his medication—AR246), neither plaintiff nor his wife ever indicated that plaintiff failed to care appropriately for his son or failed to pick him up on time after school. AR209-16, 232-39, 244-51, 233.

In August 2020 plaintiff wrote on his function report that his impairments did not affect his ability to concentrate, understand, and follow instructions. AR214. He indicated he could sometimes follow instructions well, and could follow spoken instructions better than written. Id. Three years later plaintiff indicated he was impaired in concentration, understanding, and following instructions. AR249. Plaintiff's wife indicated he could follow instructions if given each task one at a time. AR237. Plaintiff could remember the birth month of persons in his family, but not the day of the month of their birthdays. AR63. He is able to close up at the donut shop where he was working at the time of the ALJ hearing so long as he was able to work from a written list of tasks. AR65-66.

Plaintiff also stated he may have been in special education in school for reading (AR58), so this is not necessarily a new condition; therefore, plaintiff was able to work full time before the accident even if he has always been somewhat impaired in reading.

When CNP Kirby evaluated plaintiff in November 2020, she wrote that plaintiff would be "best" in a job that does not require "**extensive** reading or learning." AR385 (emphasis added).

When Dr. Swenson evaluated plaintiff, he found that plaintiff's attention, recent and long-term memory were adequate, his immediate recall of verbal matter was poor, and his levels of logical reasoning, judgment and vocabulary were low-average. AR394. Dr. Swenson found plaintiff understood and followed instructions adequately while his factual knowledge and mental calculations were below average. Id.

The ALJ's mental RFC provided that plaintiff could understand, remember, and carry out simple instructions using judgment to make simple work-related decisions and dealing with occasional changes. AR22. This is supported amply by the evidence in the record. No extensive reading or learning—as recommended by Kirby—is required in any of the three jobs identified by the ALJ (details of which are discussed more fully below). The court recommends affirming the ALJ with regard to the mental RFC he formulated for plaintiff. It was not inconsistent with CNP Kirby's opinion, nor was it inconsistent with the record evidence.

**3. Physical RFC**

Plaintiff also relies on CNP Kirby's opinion regarding his assertion of error in formulating his physical RFC. Docket No. 9 at 22. Specifically, CNP Kirby opined that, due to plaintiff's rare finding of vestibular dysfunction, plaintiff would be safest on non-elevated surfaces. Id. (citing AR338). As discussed above, the ALJ rejected Kirby's opinion regarding plaintiff's ability to lift and carry, but otherwise found Kirby's opinion persuasive. Because the ALJ did not reject Kirby's opinion as to elevated surfaces, and because the physical RFC did not include any limitations regarding elevated surfaces, plaintiff argues this case must be reversed and remanded. Id. at 22-25.

The Commissioner argues that the portion of the RFC specifying that plaintiff should not be exposed to hazards encompassed the limitation that he not be exposed to elevated surfaces, which are one variety of hazards. Docket No. 13 at 11-12.

Plaintiff responds in his reply brief that "hazards" is vague and the Commissioner has pointed to no factual or legal authority that "hazards" includes "elevated surfaces." Docket No. 14 at 5. In Hensley, the claimant argued that the RFC—which included that the claimant never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs—ignored his doctor's note that he should have a ground-floor apartment with no stairs. Hensley, 829 F.3d at 931, 932-33. The court held that the ALJ was not required to discuss every piece of evidence and, in any event, none of the jobs the ALJ identified at step five required Hensley to climb ramps or stairs. Id. at

932-33. Accordingly, the court examines the actual requirements of the jobs the ALJ identified at step five for plaintiff in this case.

The job of routing clerk, Dictionary of Occupational Title (DOT) 222.687-022, is described as:

> Sorts bundles, boxes or lots of articles for delivery: Reads delivery or route numbers marked on articles or delivery slips, determines locations of addresses indicated on delivery slips, using charts. Places or stacks articles in bins designated according to route, driver, or type. May be designated according to work station as Conveyor Belt Package Sorter (retail trade). May sort sacks of mail and be known as Mail Sorter.

https://occupationalinfo.org/22/222687022.html, last checked August 18, 2026.

The job of sales attendant, DOT 299.677-010, is described as:

> Performs any combination of following duties to provide customer service in self-service store: Aids customers in locating merchandise. Answers questions from and provides information to customer about merchandise for sale. Obtains merchandise from stockroom when merchandise is not on floor. Arranges stock on shelves or racks in sales area. Directs or escorts customer to fitting or dressing rooms or to cashier. Keeps merchandise in order. Marks or tickets merchandise. Inventories stock.

https://occupationalinfo.org/29/299677010.html, last checked August 18, 2026.

The final job identified by the ALJ, collator operator, DOT 208.685-010, is described as:

> Tends machine that assembles pages of printed material in numerical sequence: Adjusts control that regulates stroke of paper pusher, according to size of paper. Places pages to be assembled in holding trays. Starts machine. Removes assembled pages from machine.

https://occupationalinfo.org/20/208685010.html, last checked August 18, 2026.

The middle three digits of each of the DOT codes referenced above describe the worker function ratings of the tasks performed in the described occupation. The numbers are broken down into three separate groups: functions regarding data (fourth digit), people (fifth digit), and things (sixth digit). See https://occupationalinfor.org/front_223.html, last checked August 18, 2026.

For all of the above jobs, the function in relation to data is "6" which the DOT defines as "comparing," the lowest, simplest function. The DOT defines "comparing" as "judging the readily observable functional, structural, or compositional characteristics (whether similar to or divergent from obvious standards) of data, people, or things."

For two of the above jobs, the function in relation to people is "8" which the DOT defines as "taking instructions—helping." Taking instructions means attending to the work assignment instructions or orders of supervisor. Helping applies to "non-learning" helpers.

The people function for the sales attendant job is "7" which the DOT defines as "serving." Serving is defined as attending to the needs or requests of people or animals or the expressed or implicit wishes of people. Immediate response is involved. Serving and taking instructions-helping are the two lowest, simplest functions in relation to people.

For two of the above jobs, the function in relation to things is "7" which the DOT defines as handling. Handling is defined as using body members, hand tools, and/or special devices to work, move, or carry objects or materials. Handling involves little or no latitude for judgment with regard to attainment of standards or in selecting appropriate tool, object, or materials. For the collator operator job, the function in relation to things is "5" which the DOT defines as tending. Tending is defined as starting, stopping, and observing the functioning of machines and equipment. Tending involves adjusting materials or controls of the machine, such as changing guides, adjusting timers and temperature gauges, turning valves to allow flow of materials, and flipping switches in response to lights. Little judgment is involved in making these adjustments. Handling is the lowest, simplest function and tending is close to the lowest, simplest function. Id.

All three jobs identified by the ALJ are in the "light" exertional category. The Commissioner's regulations define "light work" as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

See 20 C.F.R. § 404.1567(b).

Nothing about the exertion level or the job descriptions of collator operator, sales attendant, or routing clerk indicates that those jobs require standing or walking on elevated surfaces. It seems extremely likely that these three identified jobs do not include such a requirement. And even if they do, the ALJ's RFC specified that plaintiff be exposed to no hazards. AR22. A hazard is defined as "an unavoidable danger or risk, even though often foreseeable." See https://www.dictionary.com/browse/hazard, last checked August 18, 2026. The danger posed by an elevated surface is the danger of falls or trips. This danger fits well within the commonly understood definition of "hazard." Therefore, the ALJ's requirement that plaintiff could not have a job involving any hazard clearly also encompasses the "unavoidable danger or risk" of an elevated surface.

Plaintiff's physical therapy records reveal that his primary complaint was neck pain and headaches—he rarely complained about lack of balance. AR414-624. When he did complain about lack of balance, it was most often in the context of not wanting to climb ladders to paint or resuming his former job where he hung from a suspended sling to paint. See AR 439, 512, 571. Those activities are not required in any of the three jobs identified by the ALJ as appropriate for plaintiff.

In arguing that "hazard" is too vague, plaintiff points out that the Commissioner has cited no legal or factual authority in support of its position that "hazards" includes elevated surfaces. But *plaintiff* has cited no legal or factual authority that "hazards" does *not* include elevated surfaces. Ultimately,

the plaintiff bears the burden of demonstrating that he is disabled and what his RFC is. Hensley, 829 F.3d at 932; Goff, 421 F.3d at 790. Because plaintiff bears the burden, and he has cited no factual or legal authority, he has failed to carry his burden to demonstrate that elevated surfaces are not contemplated by the RFC's prohibition on encountering "hazards" in the workplace. The court recommends affirming the ALJ's formulation of plaintiff's physical RFC.

**CONCLUSION**

Based on the foregoing facts, law, administrative record, and analysis, this magistrate judge respectfully recommends that the final decision of the Social Security Administration below be affirmed. The ALJ's decision as challenged by plaintiff herein is supported by substantial evidence in the record.

**NOTICE OF RIGHT TO APPEAL**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), unless an extension of time for good cause is obtained. FED. R. CIV. P. 6(b)(1), 72(b)(2). Failure to file timely objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990). Objections must be timely and specific in order to require *de novo* review by the District Court. Id. at 357–58.

DATED this 18th day of August, 2026.

BY THE COURT:

Veronica L. Duffy
United States Magistrate Judge